**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARLENE N.,                          )
                                     )
     Plaintiff,                  )
                                     )     No. 18-cv-03588
     v.                          )
                                     )     Judge Andrea R. Wood
ANDREW MARSHALL SAUL,                )
Commissioner of Social Security,     )
                                     )
     Defendant.                  )

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal from an adverse decision by an Administrative

Law Judge ("ALJ"). *See* 42 U.S.C. § 405(g). Plaintiff Marlene N. claims that she is disabled

based on both physical and mental impairments: she has undergone three kidney transplants and

suffers from depression and anxiety. Plaintiff seeks review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. Both Plaintiff and

the Commissioner have moved for summary judgment. (Dkt. Nos. 10, 16.) Plaintiff contends that

the ALJ erred by, among other things, discounting her symptoms, ignoring evidence in the record,

and rejecting the opinion of her treating physician. The Court finds that the ALJ's rationales, as

currently explained, are insufficient to support the decision and therefore remands the case for

further proceedings.

## BACKGROUND

Plaintiff filed for disability benefits on September 4, 2014. (Admin. R. ("A.R.") 10, Dkt.

No. 9-1.) Since 2002, she had worked as a teacher's aide and hall assistant monitor at a high

school. (*Id.* at 35.) But in August 2014, she stopped working full-time after "something changed

in [her] brain." (*Id.* at 36.) Plaintiff explains that she was sleeping all the time, was worried all the time, and "felt like [she] was going crazy but [she] did not know [the cause] until the doctor told [her] that it was depression." (*Id.*) She did not resume full-time work, but (as of January 2017) worked part-time at a high school as a substitute hall monitor and attendance office clerk one or two days per week. (*Id.* at 34.) She was insured under the Social Security Act through December 31, 2019. (*Id.* at 10.)

In her initial application for disability benefits in September 2014, Plaintiff listed several impairments that limited her ability to work, including kidney failure, coronary artery disease, immunosuppression, depression, high blood pressure, and difficulty with memory and concentration. (*Id.* at 190.) The Social Security Administration initially denied Plaintiff's application in January 2015 and denied the application on reconsideration in July 2015. (*Id.* at 78–82, 88–91.) Plaintiff had a hearing before an ALJ on January 27, 2017. In July 2017, the ALJ issued a written opinion concluding that Plaintiff was not disabled at the relevant time.

## I. Plaintiff's Medical Records

Plaintiff has undergone three kidney transplants, most recently in late 2001. (*Id.* at 389.) Dr. Holly Kramer, a nephrologist, has treated Plaintiff since 2010. (*Id.* at 462.) In July 2014, Plaintiff told Dr. Kramer that she was experiencing insomnia, inability to concentrate, and memory problems. (*Id.* at 313.) Dr. Kramer diagnosed Plaintiff with depression in July 2014 and prescribed psychotropic medications. (*Id.* at 353.) Dr. Kramer adjusted the medication based on adverse responses in September and October 2014. (*Id.* at 363, 368–69.)

After first applying for disability benefits in September 2014, Plaintiff expressed that she was experiencing worsening symptoms, including having no energy, feeling very sad, being unable to sleep at night, and feeling anxious and afraid to walk her dog. (*Id.* at 361, 367.) She

began mental health treatment with psychologist Dr. Michael Hakimi and psychiatrist Dr. Prashanth Tamragouri in February 2015. (*Id.* at 387–92.) Plaintiff reported to Dr. Tamragouri that she felt sad much of the time, lacked motivation, did not clean her house, did not leave the house, could not concentrate, and did not sleep well. (*Id.* at 391–92.) She also explained that she had left her job because she felt very depressed and on the verge of a nervous breakdown. (*Id.* at 394.) But Plaintiff also told Dr. Tamragouri that she would qualify for a pension if she could work just eight more months in a school setting. (*Id.*) She expressed her interest in continuing to work so that she could qualify for that benefit. (*Id.*) A few days later, Plaintiff met with Dr. Kramer for a follow-up kidney-related appointment, where she reported that that she felt markedly better and had no complaints. (*Id.* at 372.)

However, Plaintiff's improved condition did not last. Later in February 2015, she met with Dr. Hakimi. She reported that she had stopped working as a teacher's aide and detention supervisor because she kept getting sick and suffered from depression. (*Id.* at 388.) Plaintiff also described being physically abused by her father and sexually abused by her uncle as a child. (*Id.* at 388–89.) She explained that a doctor had previously told her that she had post-traumatic stress disorder. (*Id.* at 389.) Dr. Hakimi assessed her present depression as being caused by "losses, childhood emotional trauma, possible sexual molestation, loss of job, [and] medical troubles." (*Id.*) He conducted a depression screening with her and concluded that she suffered from "severe depression"—the most serious category of depression listed in the evaluation tool. (*Id.* at 389–90.)

Plaintiff continued to receive regular psychological and psychiatric treatment over the next year. She reported a lack of energy and motivation and discussed her interest in resuming work so that she could receive a pension. (*Id.* at 384.) Plaintiff expressed that getting out of bed was "progress" for her and that she wanted to clean up her house so that her clutter would not burden

her daughters after she died. (*Id.* at 398.) By August 2015, Plaintiff reported that she was feeling "a lot better" and that she wanted to go back to work. (*Id.* at 410.) At her request, Dr. Hakimi provided a letter clearing her to return to work. (*Id.* at 411.) But just the next month, Plaintiff reported that her life was "absolutely nuts" and that "I think I am nuts too." (*Id.* at 412.) She returned to work part-time at her school on an on-call, as-needed basis. (*Id.* at 412–13.) Then, in October 2015, Plaintiff again reported that she was feeling better. (*Id.* at 413–14.) But by late November, her mood had shifted again and her condition had deteriorated; she expressed that she was trying not to let her mood worsen and mentioned that her kidney medicines made her feel "foggy" and forget things. (*Id.* at 415–16.) She went several months without treatment, and then saw Dr. Hakimi again in August 2016, reporting intense anxiety, fear of kidney failure, concern about being able to secure her pension payment, and consistent depression. (*Id.* at 434–35.) Later that month, she saw another psychiatrist, Dr. Layna Glenn. (*Id.* at 436.) Plaintiff reported that her anxiety and depression were increasing; Dr. Glenn recommended that she increase her dosage of anti-depression medication. (*Id.* at 436–38.) In September 2016, Plaintiff reported that her mood had improved. (*Id.* at 438–39.) She decided not to return to her part-time job at the school, which Dr. Hakimi had encouraged her to leave. (*Id.* at 435, 439.)

Plaintiff's nephrologist, Dr. Kramer, provided a medical opinion dated January 11, 2017. (*Id.* at 462–64.) Although she described Plaintiff's prognosis as "good," she also listed numerous symptoms from medically documented impairments, including non-restorative sleep, severe fatigue, depression, dizziness, impaired concentration, obesity, anxiety, lack of endurance, and cognitive impairment. (*Id.* at 462.) She concluded that Plaintiff's descriptions of fatigue were credible; that her concentration and attention were constantly impacted by fatigue and pain; that Plaintiff faced severe limitation in dealing with work stress; and that Plaintiff's medication may

have been causing lightheadedness and drowsiness. (*Id.* at 463.) Dr. Kramer further opined that Plaintiff would need to be absent from work more than three times per month, that Plaintiff had "been battling depression since 2010—off and on," and that Plaintiff was unable to concentrate and felt very fatigued. (*Id.* at 463–64.)

Dr. Glenn also submitted a letter dated January 20, 2017, although Plaintiff does not contend that it constituted a medical "opinion." Dr. Glenn noted that Plaintiff had received psychiatric and psychological treatment since 2015 and that, in August 2016, she "reported worsening depressed mood with poor sleep as well as decreased energy and concentration . . . [and] significant anxiety." (*Id.* at 465.) She also noted that Plaintiff's antidepressants, which had previously been helpful, appeared to be losing effectiveness and that Plaintiff's depression appeared to be worsening. (*Id.*) Dr. Glenn's letter concluded, "With proper treatment there is always the possibility of improvement." (*Id.*)

A hearing was held before the ALJ on January 27, 2017, where Plaintiff was represented by an attorney. She testified that "something changed in [her] brain" in August 2014—she was sleeping all the time, constantly worried, and anxious. (*Id.* at 36.) As a result, she stopped working full time. (*Id.*) Plaintiff also testified that, as of January 2017, she had extreme difficulty sleeping due to her anxiety, did not go out, struggled to clean her house, and had not held Christmas or Thanksgiving dinners. (*Id.* at 42.) Although Plaintiff's two grandchildren visited every day, she did not have energy to play with them, take them to the park, or engage in similar activities. (*Id.* at 44.) She occasionally drove (but only with her husband), had stopped cooking for her family, and did not walk her dogs. (*Id.* at 45–46.) Plaintiff further testified that she had trouble concentrating on television shows and felt very bad inside. (*Id.* at 46.) She stopped visiting with friends and had

trouble concentrating to read longer texts, like magazine articles or books. (*Id.* at 47.) A vocational expert testified but no medical expert was called.

## II.     The ALJ's Findings

On July 11, 2017, the ALJ issued a written decision finding that Plaintiff was not disabled between August 29, 2014 and the date of his decision. (*Id.* at 19.) The ALJ reached the following conclusions. Plaintiff met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity since the date of her claim, as confirmed by her reports of limited part-time work and her earnings records. (*Id.* at 12.) Plaintiff suffered the severe impairments of depression, anxiety, and "status post kidney transplant" (meaning that she previously underwent a kidney transplant) pursuant to 20 C.F.R. § 404.1520(c). (*Id.*) However, her impairments did not meet or medically equal the criteria of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 because (1) there was no evidence that Plaintiff's kidney transplants impaired her at an equivalent level to listing 6.00 (genitourinary disorders), and (2) the severity of Plaintiff's mental impairments, considered individually and together, did not meet or approximate the criteria of listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (*Id.* at 13.) The ALJ found only moderate limitation caused by Plaintiff's mental impairments across four broad areas of function: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.* at 13–14.)

The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform medium work, with some exceptions. (*Id.* at 14.) Among other things, the ALJ found that Plaintiff could not work at heights or in hazardous environments, could not work in direct public

service or in crowded, hectic environments, and was limited to jobs involving simple, routine tasks with simple decision-making. (*Id.*)

The ALJ was not persuaded by much of the testimony and medical evidence presented to him. The ALJ concluded that Plaintiff overstated her symptoms, at least compared to the documented medical evidence submitted in her case. (*Id.* at 15–16.) The ALJ noted improvement and periods of relatively good functioning in Plaintiff's mental health and did not find support in the record for the degree of limitation that Plaintiff reported. (*Id.*) The ALJ further concluded that Plaintiff's mental status was marked by "mixed" findings, but the impairments established in the record were generally mild. (*Id.* at 16.) The ALJ noted that Plaintiff acknowledged that she did some cleaning and the record indicated improvement in her sleep and social interaction. (*Id.*) The record did not support any significant impairments to Plaintiff's memory. (*Id.*) Finally, although Plaintiff reported that she could only lift 8–15 pounds, stand for ten minutes, and walk for four blocks, the ALJ found no evidence for those limitations in the record. (*Id.*)

The ALJ also considered medical opinions from two state agency medical consultants. Dr. Erika Montgomery reviewed Plaintiff's medical records through October 8, 2014 and concluded that her disabilities were not as severe as reported. (*Id.* at 59–66.) On reconsideration, Dr. Donald Cochran reviewed medical records through June 23, 2015, but found that there was no additional medical evidence that would justify reversing the initial denial. (*Id.* at 68–76.) The consultants determined that Plaintiff did not have any severe physical impairments and had only mild restriction and difficulties in daily living, social functioning, and concentration, persistence, and pace. (*Id.* at 16.) However, the ALJ noted that the consultants completed their reviews before the final submission of Plaintiff's medical records, and those medical records demonstrated at least

some abnormal mental status findings. (*Id*. at 16–17.) For these reasons, the ALJ assigned little weight to their opinions. (*Id.*)

Finally, the ALJ considered Dr. Kramer's opinion that Plaintiff faced severe limitations that would cause her to be absent from work more than three days per month. (*Id*. at 17.) The ALJ stated that the medical record did not support Dr. Kramer's conclusion, giving the example that Dr. Kramer's February 2015 treatment notes stated that Plaintiff "felt markedly better and had no complaints, had a normal mood and affect, demonstrated normal behavior, and judgment and thought content were normal." (*Id.*) The ALJ further stated that "The record shows the claimant generally continued to improve thereafter. July 2015 treatment notes state the claimant had no complaints and March 2016 records note the claimant felt well overall with no complaints and normal psychiatric findings." (*Id.*) For these reasons, and because the ALJ concluded that no other evidence supported Dr. Kramer's conclusions, the ALJ assigned little weight to Dr. Kramer's opinion. (*Id.*)

In the end, the ALJ found that Plaintiff could not perform her past relevant work as a teacher's aide based on her RFC. (*Id.*) Nonetheless, the ALJ concluded that there were jobs in significant numbers in the national economy that Plaintiff could perform—for instance, as a laundry worker. (*Id.* at 18–19.) Because Plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy, the ALJ concluded that Plaintiff was not disabled. (*Id.*)

## DISCUSSION

The Court reviews the ALJ's disability determination to evaluate whether his stated rationales were supported by "substantial evidence." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Substantial evidence requires only "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court's review is deferential, but the ALJ must consider certain factors prescribed by

regulation and cite evidence in the record in support of his credibility findings. *Shauger*, 675 F.3d

at 696. "[E]ven if reasonable minds could differ on the ALJ's rejection of [the claimant's]

testimony, [the Court] will not reweigh evidence or substitute [its] judgment for the ALJ's." *Zoch

v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). The Seventh Circuit, however, has emphasized that

review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (stating

that a "mere scintilla" is not substantial evidence). A reviewing court must conduct a "critical

review" of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534

F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the

Commissioner's decision, it will not be affirmed if the ALJ does not "build an accurate and

logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.

2008).

To determine whether a claimant is disabled, the ALJ employs a five-step sequential

evaluation process. 20 C.F.R. § 404.1520(a)(4). The ALJ determines, in the following order: (1)

whether the claimant is not currently engaged in substantial gainful activity; (2) whether the

claimant has a severe medically determinable physical or mental impairment; (3) whether the

impairment meets the criteria of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4)

whether the claimant's RFC renders her unable to perform her past relevant work; and (5) whether

the claimant's RFC, age, education, and work experience make her unable to adjust to other work

existing in significant numbers in the national economy. *Id.* "A negative conclusion at any step

(except for step three) precludes a finding of disability. An affirmative answer at steps one, two,

or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Plaintiff contends that the ALJ's decision should be reversed or remanded because the ALJ ignored evidence regarding her limitations at Step Three of the evaluation process, cherry-picked evidence regarding Plaintiff's symptoms, rejected the opinion of Plaintiff's treating physician without a sufficient basis, and based his opinion on unreliable testimony from the vocational expert.

### I. Degree of Limitations

Plaintiff first contends that the ALJ did not sufficiently consider her limitations at Step Three, undermining his ultimate decision. At Step Three, an ALJ assesses a claimant's degree of limitation across four different areas—understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(4). The claimant's degree of limitation in each category is rated using a five-point scale: none, mild, moderate, marked, and extreme. *Id.* An "extreme" degree of limitation means that a claimant cannot do any gainful activity, while a limitation classified as "none" or "mild" is generally not considered severe. 20 C.F.R. § 404.1520a(c)(4), (d)(1).

The ALJ found that Plaintiff's restrictions in each category were moderate. (A.R. 13–14.) Plaintiff contends that the ALJ should have applied more significant limitations. She emphasizes that her treating physician, Dr. Kramer, opined that she suffered fatigue, pain, severe limitation in dealing with work stress, lightheadedness and drowsiness from medication, and concentration and memory deficits. (*Id.* at 463.) That said, Plaintiff does not argue that the ALJ was required to find her disabled at this step—only that his analysis at this step tainted his later findings.

Certainly, the ALJ's opinion failed to consider evidence in the record regarding Plaintiff's limitations. Plaintiff testified that she experienced significant social isolation: she did not go out, did not see friends, and, by the time of the hearing, had stopped holding holiday dinners. (*Id.* at 42.) These statements were supported by treatment records from Dr. Tamragouri regarding Plaintiff's isolation, among other items in the record. (*Id.* at 391–92.) But the ALJ, in describing Plaintiff's functioning in interacting with others, noted that she "has friends, but does not see them," which understates the extent of Plaintiff's isolation indicated by the record. Similarly, when evaluating Plaintiff's ability to adapt or manage herself, the ALJ noted that she washes dishes, watches her granddaughter, shops in stores and on her computer, and can take care of most of her personal finances. (*Id.* at 14.) But Plaintiff testified that she does not go out, is frightened by her faulty memory, lacks energy to engage with her grandchildren, and does not drive alone. (*Id.* at 42, 44–45.) The ALJ understated, misstated, or failed to mention important parts of Plaintiff's testimony.

At points, the ALJ failed to build a bridge between the evidence and portions of his opinion. In several instances, the ALJ apparently copied and pasted the same description of Plaintiff's abilities across multiple functional areas of assessment. Further, some of the evidence he cited was not connected to the corresponding functional area. For example, the fact that Plaintiff goes outside in her yard almost every day and sometimes goes outside to clean up after her dog does not demonstrate her ability to interact with others (*Id.* at 13.) Likewise, the fact that Plaintiff plays solitaire has no clear connection to her ability to adapt or manage herself. (*Id.* at 14.)

Plaintiff contends that she was prejudiced by the ALJ's incomplete assessment at Step Three because it led the ALJ to overestimate her ability to work. Specifically, Plaintiff testified

that she slept often, struggled to remember things, and struggled to concentrate. (*Id.* at 36, 42, 46.) The ALJ did note that Plaintiff stated that her energy level had improved in March 2015. (*Id.* at 386.) But, as discussed above, Plaintiff experienced notable downturns in September 2015, November 2015, and August 2016. (*Id.* at 412–13, 415–16, 434–35.) By emphasizing Plaintiff's higher-functioning periods and ignoring her lower-functioning periods, the ALJ presented a skewed picture of Plaintiff's capabilities.

The Commissioner responds that any error was not harmful because the record rebuts Plaintiff's allegations. For example, in October 2014, Plaintiff stated that she prepared foods such as soup, spaghetti, and sandwiches every other day, and in May 2015, Plaintiff stated that she prepared simple meals almost every day. (*Id.* at 224, 241.) At her hearing in January 2017, Plaintiff stated that she used to cook, but that she had stopped doing so and it was harder to cook because she had stopped eating meat because of her ethical beliefs. (*Id.* at 45–46.) The Commissioner suggests that Plaintiff stopped cooking not because she was depressed, but instead because she became a vegetarian. But the record does not suggest that conclusion—it is possible that Plaintiff cooked semi-regularly in October 2014 and May 2015 but had stopped cooking by January 2017. Likewise, many of the meals Plaintiff previously described preparing—such as soup, spaghetti, sandwiches, tomato soup, and grilled cheese—can easily be prepared without using meat, so it does not make sense to attribute Plaintiff's decreased activity simply to her vegetarianism. Here and elsewhere, Plaintiff may have been prejudiced by the ALJ's failure to grapple directly with the limitations she reported, and the record does not show that those errors were harmless.

Because the ALJ focused on Plaintiff's capabilities but ignored many of the limitations she expressed, the ALJ failed to consider Plaintiff's evidence sufficiently. The ALJ was not required

to discuss every piece of evidence in writing. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). But the sufficiency of the analysis is undermined by the ALJ's failure to address substantial portions of Plaintiff's evidence. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (holding that an ALJ may not ignore a contrary line of evidence). As discussed below, the ALJ's failure to provide a thorough analysis at Step Three is indicative of a broader failure to fully engage with the evidence that Plaintiff presented. Thus, although the ALJ's entire decision can be considered in determining whether his conclusions at any step were adequately reasoned, *see Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015), similar flaws reoccurred throughout the ALJ's opinion.

## II. Symptoms Analysis

The ALJ painted a fairly rosy picture of Plaintiff's condition. He wrote that although Plaintiff initially met six criteria for major depression, the record subsequently showed that she "felt markedly better and had no complaints," her energy level improved, her mood improved, her kidney was functioning well, and her mood was stable, demonstrating a pattern of overall improvement. (A.R. 15–16.) Plaintiff contends that the ALJ failed to address substantial portions of the evidence she presented.

It is reversible error for an ALJ to discuss only the facts the support his conclusion and ignore contradictory facts. *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ . . . cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). The bottom-line question in the disability analysis is whether a person can consistently work full-time; a mere improvement in symptoms over time is irrelevant unless that improvement allows the person to work full-time. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply

because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work.").

Here, the ALJ cherry-picked evidence showing improvement without addressing evidence showing deterioration in Plaintiff's functionality. In doing so, he also failed to consider the timing of certain evidence. For example, the ALJ noted that Plaintiff told her nephrologist Dr. Kramer that she "felt markedly better" and "had no complaints" in February 2015. (A.R. 15.) But the purpose of that visit was not treatment for depression and anxiety but instead follow-up on Plaintiff's kidney transplant; Dr. Kramer's treatment note was barely more than a single line long and noted that Plaintiff was receiving psychiatric treatment for depression. (*Id.* at 372.) The notes from Plaintiff's treatment for depression that month were much more extensive. Her mental health providers concluded that she met the criteria for "severe depression" and noted that although Plaintiff wanted to work, she had left her job because she felt she was on the verge of a nervous breakdown and could not concentrate, complete chores, or leave the house. (*Id.* at 389–94.) It was plainly inadequate for the ALJ to summarize Plaintiff's status as "feeling markedly better," because doing so ignored the results of her mental health treatment in February 2015. As discussed above, Plaintiff continued to experience downturns and fluctuations in mood and condition. In August 2016, Plaintiff's psychiatrist Dr. Glenn increased her dosage of anti-depressant medications. (*Id.* at 436–38.) Dr. Glenn noted that Plaintiff's depression appeared to be worsening. (*Id.* at 465.) The ALJ's opinion does not adequately account for these downturns.

Courts often remand cases where an ALJ has failed to consider the possible episodic nature of symptoms, particularly in cases of mental illness. *See*, *e.g.*, *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) ("[C]herry-picking is especially problematic [because] a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single

moment says little about [her] overall condition." (internal quotation marks omitted)); *Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, at *5 (N.D. Ill. Dec. 15, 2017) ("[T]he ALJ's opinion does not reflect an understanding that a person under treatment for a chronic disease, whether physical or psychiatric, is likely to have 'better days and worse days' and symptoms that 'wax and wane.'"). Here, the record suggests that Plaintiff's symptoms did not improve in a lasting way and that her symptoms were waxing and waning.

The ALJ acknowledged Dr. Glenn's conclusion that Plaintiff's depression was worsening. (A.R. 16.) But he also noted that Plaintiff sometimes forgot to take her medication, emphasizing Dr. Glenn's opinion that improvement was possible with proper treatment. (*Id.*) The ALJ did not consider whether Plaintiff's mental illness might impede her from regularly taking her medications. *See, e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." (citations omitted)). To the extent the ALJ suggested that Plaintiff could function effectively simply by taking her medications more regularly, he did not address the difficulties she might face in adhering to such a regimen, for example as a result of her forgetfulness, inability to concentrate, and lack of motivation. Further, it appears that the ALJ substituted his own judgment for the judgment of Plaintiff's treating physicians. None of the doctors who actually treated Plaintiff concluded that the record demonstrated general improvement or that Plaintiff's impairments were merely mild. Instead, the ALJ reached this conclusion by reviewing those notes, but in doing so he made medical conclusions that went beyond the doctors' notes and opinions. *See Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, at *4 ("It is well-settled that treating physicians are in the best position to interpret their own clinical findings.").

Certainly, the ALJ did not err in rejecting some of Plaintiff's testimony about her limitations. For example, Plaintiff testified that she could only stand for ten minutes and walk for four blocks and that she could not remember anything. (A.R. 16.) The record lacks evidence of such substantial impairments and Plaintiff has not identified portions of the record supporting her assertions. Likewise, the ALJ noted that Plaintiff reported improvements in mood, energy level, and sleep in February, March, and May 2015, and had resumed doing odd jobs and substitute teaching as of February 2016. (*Id.* at 15–16, 372, 380–81, 386, 417.) But because the ALJ failed to duly consider evidence in the record indicating that Plaintiff was disabled, his assessment of Plaintiff's symptoms is incomplete.

For these reasons, this Court concludes that a remand is appropriate so that the ALJ can address both positive and negative developments in Plaintiff's symptoms over time. "We do not state that the ALJ's view of the facts is ultimately wrong, we simply hold that [his] apparent selection of only facts from the record that supported [his] conclusion, while disregarding facts that undermined it, is an error in analysis that requires reversal." *Scrogham*, 765 F.3d at 699.[1]

### III. Medical Opinion Analysis

An ALJ must give controlling weight to a treating source when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2);[2] *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). However, if the opinion is not well-supported

---

[1] In the medical records, Plaintiff provided self-assessments of her overall functioning; her medical providers also provided numerical assessments of her stability and mental condition. *See, e.g.*, A.R. 385, 388, 398. The parties debate the meaning of those numerical assessments because the "key" to those evaluations is often ambiguous—for example, the record does not plainly establish whether a "7" is a good or bad evaluation. But even interpreting those numbers as the Commissioner does, the Court still concludes that the ALJ did not sufficiently analyze the evidence before him and provide a sufficient basis for his conclusions.

[2] This regulation applies to claims that, like Plaintiff's, were filed before March 27, 2017.

or is inconsistent with the record, the ALJ must, in the second step of the analysis, determine what specific weight, if any, the opinion should be given. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). In making this determination, the ALJ must apply the checklist of six factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). These factors are: (1) the length of treatment and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c)(2). "An ALJ who does not credit such an opinion [from a treating source] must offer good reasons for doing so and must address the appropriate weight to give the opinion." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). But "[i]f the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons—a very deferential standard that we have, in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (internal quotation marks omitted). The larger principle embodied in the rule is that, all things being equal, a treating physician's opinion deserves deference. *See Koelling v. Colvin*, No. 14 CV 50018, 2015 WL 6122992, at *8 (N.D. Ill. Oct. 16, 2015) ("[W]ithin the weighing process, treating physician opinions receive particular consideration.").

The ALJ did not acknowledge or analyze the two steps of the rule, nor did the ALJ mention the six checklist factors. One of the ALJ's rationales—perceived inconsistencies between Dr. Kramer's opinion and the remainder of the medical record—implicates the third and fourth factors. But the record contains evidence going to the other factors—for example, that Dr. Kramer had treated Plaintiff for several years, had prescribed psychotropic medication to Plaintiff, and was familiar with side effects of medication for kidney disease that could interfere with Plaintiff's

ability to work (like lightheadedness and drowsiness (*see* A.R. 463)). This evidence suggests that Dr. Kramer's opinion should have been given more weight, but the ALJ did not discuss it.

At the administrative hearing, the ALJ asked Plaintiff's counsel on multiple occasions what records supported Dr. Kramer's opinions regarding the number of absences Plaintiff would need every month, her extreme fatigue, and her inability to concentrate. (*Id.* at 38–39.) The ALJ stated that there did not appear to be enough evidence in the record to support that degree of impairment. (*Id.*) In response, Plaintiff's counsel seemed to concede a deficit, responding, "I don't think that's an unreasonable look at the record as it exists so far" and noting that he was waiting for further notes from Plaintiff's psychological treatment. (*Id.* at 39.) Plaintiff had an opportunity to supplement the record with such evidence, but her briefs do not establish whether she did so. Further, although Plaintiff offered a letter from her psychiatrist Dr. Glenn and treatment notes from other physicians, none of those documents were entitled to controlling weight because they did not provide an opinion regarding the extent of Plaintiff's limitations or her residual capabilities. *See Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

Nevertheless, the ALJ did not adequately explain why he, in effect, completely discounted Dr. Kramer's opinion. Although he stated that he gave the opinion "little weight," practically speaking, he gave the opinion no weight. (A.R. 17.) The ALJ explained that Dr. Kramer's conclusions were inconsistent with the medical record, including Dr. Kramer's own treatment notes, which reflected that (at certain times) Plaintiff felt better, had no complaints, and had normal behavior, judgment, mood, thought content, and psychiatric findings. (*Id.*) But, as discussed above, it is not inherently inconsistent for Plaintiff to have felt better at certain times while also experiencing impairments that prevented her from holding full-time employment. And the ALJ also gave only little weight (again, in practice, no weight) to the state agency medical

consultants. In other words, the ALJ did not reject Dr. Kramer's opinion in favor of other medical opinions. The ALJ also did not identify medical evidence supporting his difference of opinion from Dr. Kramer's assessment. "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Instead of making his own medical conclusions, the ALJ could have "obtained a medical opinion based on a complete record." *Stage*, 812 F.3d at 1126.

Further, to the extent that the ALJ discounted Dr. Kramer's opinion because of Plaintiff's housework and childcare activities, the ALJ may have improperly equated those domestic tasks with an ability for full-time work. "[T]he sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity." *Scrogham*, 765 F.3d at 700 (internal quotation marks omitted); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (describing the failure to recognize differences between activities of daily living and requirements of full-time work as "a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

Finally, the ALJ applied many limitations to Plaintiff in defining her RFC. (A.R. 14.) For this reason, the Commissioner contends that the ALJ adequately considered Plaintiff's evidence in reaching his conclusion. But the ALJ's RFC assessment is inconsistent with Dr. Kramer's opinion; the ALJ determined that Plaintiff could perform medium work as defined by 20 C.F.R. § 404.1567(c) (defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds"), while Dr. Kramer concluded that Plaintiff could not perform any full-time work due to her depression and inability to concentrate and remember.

Again, although Dr. Kramer's opinion may not be entitled to deference, Plaintiff was entitled to a thorough explanation of the ALJ's decision to reject it.

In sum, the ALJ did not minimally articulate the reasons for his conclusions and did not demonstrate that he adequately considered the relevant factors. A remand is required so that the ALJ can fully and fairly consider Dr. Kramer's opinion.

## IV. Vocational Expert Testimony

At the hearing, a vocational expert stated that Plaintiff could work in "positions such as laundry worker" and that 197,000 such jobs existed in the national economy. (A.R. 53–55.) The vocational expert did not list other occupations available to Plaintiff, although she did acknowledge that laundry worker was only a "representative" job available to Plaintiff. (*Id.* at 55.) Plaintiff's counsel asked the expert about the source of her estimate but did not object to or otherwise dispute the expert's testimony. (*Id.* at 56.) Plaintiff now challenges the ALJ's supposed reliance on only one occupation to determine that there was work available to her and contends that the vocational expert did not establish an adequate source for the number of laundry worker jobs.

To determine whether work exists in the national economy for a claimant, an ALJ considers whether "there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). The Commissioner holds the burden of establishing that such work exists for a person with the claimant's RFC. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). The Seventh Circuit has cautioned that an ALJ should not uncritically accept a vocational expert's estimate of available jobs without considering the source or accuracy of the estimate. *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015). However, a claimant waives

objections to a vocational expert's testimony when she fails to object during the hearing. *Brown v. Colvin*, 845 F.3d 247, 254 & n.1 (7th Cir. 2016).

Here, Plaintiff waived her challenge to the expert's testimony by failing to object at the hearing. Further, the vocational expert did testify to the source and accuracy of her estimate, explaining that she relied on numbers from the Department of Labor's Bureau of Labor Statistics, used "multi-varying analysis," and spot checked her numbers using a third-party service. (A.R. 56.) While the expert did not explain her methodology in detail, she explained the source of her numbers and provided some indicia of accuracy. The ALJ did not err in relying on the vocational expert's testimony, especially considering Plaintiff's failure to raise an objection during the hearing.

Nor can Plaintiff protest that the ALJ only identified one occupation in which she could work. The pertinent regulation requires only that a significant number of jobs be available to Plaintiff in ***one or more*** occupations. 20 C.F.R. § 404.1566(b). Likewise, the ALJ was not required to establish the number of jobs available to Plaintiff at a regional level (as opposed to a national or local level), as Plaintiff argues. *See Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014) ("[I]f there is a large number of such jobs in any of the three areas [national, regional, or local] . . . the claimant loses."). Under special circumstances—for example, where a claimant's disability prevents her from moving—the ALJ may be required to consider the jobs available locally to the claimant. *Id.* But Plaintiff has offered no reason why a national estimate is inadequate. Thus, the ALJ's acceptance of the vocational expert's estimate is outside the scope of the remand of this decision.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 10) is granted and the Commissioner's motion (Dkt. No. 16) is denied. This case is remanded to the Commissioner for further consideration consistent with this opinion.

ENTERED:

Dated: June 18, 2021

_____
Andrea R. Wood
United States District Judge